# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JOHNNY WELLS,                          )
                                       )
              Petitioner,              )
                                       )
       v.                              )      No. 06 C 2536
                                       )
KEN BARTLEY,                           )
                                       )
              Respondent.              )


## MEMORANDUM OPINION AND ORDER

_____

        Petitioner Johnny Wells ("Wells") has brought a petition
pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus. In 2001,
a jury convicted Wells of the attempted first-degree murder of
Belinda Smith ("Smith") and the aggravated battery of Gary Harris
("Harris"), and Wells received concurrent 30-year and five-year
prison terms. Wells is currently in the custody of the State of
Illinois Department of Corrections, and is incarcerated at the
Pickneyville Correctional Center where respondent Ken Bartley is
the warden. For the following reasons, I deny the petition.

I.

A.  Evidence Presented at Trial

The facts relevant to Wells' claims are as follows:[1]  in 2001, a
Cook County jury convicted Wells of attempted first-degree murder
for the stabbing of Smith and aggravated battery for the stabbing
of Harris.   At  trial,  Smith  testified  that  she  had  been
romantically involved with Wells and had lived with him from 1991
to 1999.  After their relationship ended, she became involved with
Harris.  She and Harris subsequently lived near Wells' residence.
Smith testified that on June 3, 1999, she was walking down the
street with Harris when Wells attacked her, cutting her face with
a knife and threatening to kill her if he saw her with Harris
again.  Smith testified that a few days later, on June 8, 1999,
Wells approached her in the backyard of the home where she lived
with Harris and again threatened to kill her.  Smith notified the

---

[1]Factual determinations made by the Illinois state courts are
presumed to be correct.  *See Miller-El v. Cockrell*, 537 U.S. 322,
324 (2003) ("Factual determinations by state courts are presumed
correct absent clear and convincing evidence to the contrary . . .
and a decision adjudicated on the merits in a state court and based
on a factual determination will not be overturned on factual
grounds unless objectively unreasonable in light of the evidence
presented in the state-court proceeding.") (citing 28 U.S.C. §§
2254(d)(2), (e)(1)).   Although the Illinois trial and appellate
courts have summarized, in various opinions, portions of what
occurred, these opinions omit some details that are necessary to
resolve Wells' petition, so I have summarized the facts anew.
Nothing in this factual summary is in conflict with the facts as
summarized by the Illinois courts.

police of both of these incidents and obtained an order of protection against Wells.[2]

Smith also testified about events that occurred on June 22, 1999. That morning, Harris walked her to a bus stop near their home so that she could catch the bus to go to job training. Smith boarded the bus and moved to the rear as the bus pulled away from the curb. At this time, she saw Wells run toward the bus. The bus stopped and Wells boarded the front of the bus. Smith ran to the back of the bus and asked the driver to open the back door; the driver complied and Smith exited the bus and ran back down the street to where Harris was standing. Wells followed her off the bus and down the street. Smith testified that when she ran back to Harris, Harris tried to use his body to block Wells from reaching her, and Wells then stabbed Harris in the shoulder with a knife. Smith kept running, but Wells caught up with her and hit her in the chest. She fell to the ground, and Wells came around "to the back" of her and stabbed her twice in the back. She testified that he then said, "Bitch, I told you I was going to kill you." Smith said that a car then turned the corner and chased away Wells. Smith described her injuries and the prosecution introduced a photograph showing Smith had scars on her back from stab wounds.

---

[2]Other than her and Harris' testimony, there was no evidence presented at trial to substantiate the June 3 and June 8 incidents.

On cross-examination of Smith, Wells' attorney elicited from Smith that when she saw Wells running to catch the bus, he looked "scary." Wells' attorney also questioned aspects of Smith's testimony, including whether Smith actually saw Wells with a knife, what Smith saw of Wells stabbing Harris, and Smith's testimony that Harris did not move toward Smith when she left the bus and ran toward him. Finally, Wells' attorney elicited that Smith had a child with Wells who lived with Wells' brother.

Harris also testified at the trial that on June 3, 1999, he was walking down the street with Smith when Wells ran toward them, pulled out a knife, and attacked Smith. Harris testified that during that attack he put himself between Wells and Smith, and that he then had to defend himself because Wells turned and "made motions with the knife in order to stab" him. Harris testified that he knocked the knife out of Wells' hand but then slipped and fell, allowing Wells to pick up the knife and cut Smith across the cheek. Harris also testified that on June 8, 1999, he was sitting in the back yard of his house with Smith when Wells "came to the fence and pointed his finger at [them] and went pow, pow, pow" and stated that he would kill Smith.

Harris testified that on June 22, 1999, he walked Smith to the bus and then stood on the street talking to someone else when it was brought to his attention that Wells was running down the street trying to catch the bus. Harris saw Wells board the bus, and then

saw Smith exit the bus and run toward him with Wells following behind.  Harris testified that Smith ran around him, and that Wells ran right behind her with a knife in his hand, attempting to stab her.  Harris said that he put his body between Wells and Smith and tried to protect Smith, but that Wells stabbed him in the shoulder and then attacked Smith.  Harris saw Wells hit Smith in the chest and, after Smith fell down, "make stabbing motions at her back, and just basically all over, whatever he could get to" while Smith was on the ground.  At this time, Harris testified that Wells said, "I told you I was going to kill you, bitch."  Harris testified that a car then turned the corner and Wells ran away.

On cross-examination, Wells' attorney elicited that at the time of the trial Harris was still romantically involved with Smith, but was not living with her.  Harris admitted that he was convicted in 1994 and again in 1998 of the delivery of a controlled substance, in both cases cocaine or crack cocaine.  He further testified that at the time Wells stabbed him in the shoulder, he did not touch Wells or try to push him away.

Vivica Griffin ("Griffin"), a bus driver for the Chicago Transit Authority, also testified during the trial.  She stated that on the morning of June 22, she was driving the bus that Smith and Wells boarded.  She stopped to pick up Smith and drove through an intersection when another man, identified in court by Griffin as Wells, ran down the street waving at the bus.  She assumed that he

was trying to catch the bus and stopped and opened the bus doors.
At that point, Smith went to the back doors of the bus and "was
screaming let her off the bus."  Griffin testified that as Wells
was climbing the bus's stairs, Smith left the bus, and that when
Wells saw her exiting the bus he "backed back down the stairs and
proceeded to chase her."  Griffin closed the doors and resumed her
route.

Willie Cole ("Cole") also testified for the prosecution.  He
testified that he knew both Harris and Smith from the neighborhood,
and that Harris occasionally worked for him.  Cole testified that
he knew Wells from the neighborhood as well, and had purchased
items from him.  Cole testified that on the morning of June 22, he
was sitting in his parked car when Harris and Smith approached and
asked him to drive them to the train station.  He was not able to
do so, but waited with Smith and Harris for the bus.  He was
standing outside his car with Harris when he saw Wells come around
the corner, flag down the bus, and board it.  Smith then exited the
back of the bus and ran back over to Cole's car.  Wells followed
her, and Harris grabbed him and "said it's not going to be none of
that stuff."  At this point Wells turned around and stabbed Harris.
Harris testified that Wells then turned around, hit Smith, knocked
her down, went around behind her and hit her in the back, and
leaned over her and stabbed her.  Cole called 911, and asked Wells
to stop.  A man then drove by and chased away Wells.

On cross-examination, Wells' attorneys led Cole to admit that on the day of the incident he told detectives that he saw Wells follow Smith out of the same doors of the bus that she had exited, even though he was not sure of that fact. Cole also admitted that he saw Harris grab Wells before Wells stabbed Harris.

In addition, the parties agreed to two stipulations. They stipulated that if an "Officer Forst" (who the parties do not identify more fully) were to testify, he would testify that he was working in police headquarters when Wells came in and said that the police were looking for him for a stabbing. "Officer Forst" would testify that he arrested Wells. The parties also stipulated that if Detective R. McVicker (who the parties also do not more fully identify) were called to testify, he would testify that he interviewed Cole and that during the interview Cole never told him that he saw Wells hit Smith.

Wells' counsel requested a self-defense instruction, at least for the attack on Harris, but the court refused to give it, finding there was no evidence that would justify such an instruction. After deliberations, the jury found Wells not guilty of the attempted first-degree murder of Harris, but guilty of aggravated battery of Harris, aggravated battery of Smith, and the attempted first-degree murder of Smith.

## B. Wells' Difficulties with Counsel

Several of Wells' claims relate to the performance of his trial counsel and his relationship with trial counsel. Wells' first attorney, a public defender, hired a forensic psychologist to examine Wells, but the psychologist's schedule prevented him from preparing his report as quickly as Wells would have liked. Prior to his trial, Wells filed a complaint with the Attorney Registration and Disciplinary Commission ("ARDC") about his first attorney's performance. At a court hearing on April 7, 2000, Wells told the court that he was not ready to make a final decision whether to have that attorney continue to represent him, but that he wanted the attorney to "go ahead with his plans to help me consult a psychiatrist."

At a pre-trial hearing on May 16, 2000, as Wells' counsel requested an extension of time for the psychologist to examine Wells, Wells stated that he did not want the public defender's office to represent him because it had taken too long to prepare his defense, and because Wells believed that his counsel was not working in his best interest. At the hearing, the court advised Wells that he could hire his own lawyer if he chose, but that any lawyer appointed for him would be a public defender. The court also strongly advised Wells not to represent himself, despite Wells' request to exercise his right to do so and to seek a speedy trial. The court advised Wells that if he represented himself he

would not have access to the psychologist that the public defender had hired and that "everything you're going to do on your own." The court questioned Wells on the rules of the court and legal issues related to his case. The court continued the proceedings until the following day. During the continuation of the proceedings a new public defender was present. Wells apologized to the court and asked if the new public defender could represent him. The court agreed since, at a subsequent proceeding on May 24, 2000, the public defender's office consented to the change.

During Wells' trial, after Smith and Harris' testimony, Wells stood up and stated, "[T]hey have proof they perjured themselves." The court excused the jury, and Wells' counsel then notified the court that Wells wanted to proceed *pro se*. The court denied the motion because Wells had already discharged and rehired his attorney. Wells again stated, "[T]hey have evidence they won't get into evidence." After a short recess, Wells apologized to the court for his outburst and withdrew his request to appear *pro se*. The court questioned Wells further, asking him if he wanted to continue with his current lawyers, and Wells said, "You had just told me it was too late, sir. Some things I just don't understand about this law, that's all to it." Wells then again reversed course, stating that he did not want to continue with his present counsel. He stated that the witnesses who had just testified had perjured themselves and that "[t]he lawyers got statements saying

everything the people said out of their mouth is a lie." After the court spoke with him further, Wells stated that he wanted to move for a mistrial until he could hire his own counsel. The court responded that it was too late to change counsel, and that Wells should work out an understanding with his current attorneys. The court also stated, "If the lawyers told you police reports can't be read into evidence, they probably told you the right thing. It's in violation of the rules." The court also told Wells that if the police reports could be used to impeach the witnesses, his attorneys would have discussed it with him.

At this point, Wells stated that "at this time I will just take a seat." When the court asked if he was ready to proceed, Wells stated "I don't – I don't know what I'm going to do at this point. I'm not trying to be disrespectful. I just don't know what to do." The court stated that if Wells did not tell him otherwise, the case would proceed and Wells would be represented by his current counsel, and Wells said that he understood. The court then proceeded with the case.

After the prosecution had finished its case-in-chief, the court asked Wells if he was communicating with his attorneys, and the court gave him a brief continuance to decide how he wanted to proceed with his defense. At the continuation of the trial, Wells declined to testify on his own behalf and at this time did not ask for new counsel or to represent himself.

At Wells' sentencing, after both attorneys had presented argument about the appropriate sentence, the court gave Wells the opportunity to speak. Wells stated that he had some things he wanted to say "just to have them on record." Wells then read some previous statements that Harris (referred to in the transcript as "Harrison") had given that differed from his trial testimony, including that Wells stabbed Smith before he stabbed Harris. Wells told the court that the witnesses had perjured themselves and that his counsel, "I don't know if it's an overlook or anything, did not even try to, what was the word you say, impeach their statements." He then stated:

> I asked for these statements to be admitted. [Counsel] told me they would be more damaging to my thing, but how can a statement be more damaging if it's going to prove that the victims and the witnesses are lying, your Honor?
> . . .
>
> I don't know how to do, your Honor, because I'm not a lawyer and you are. I went up under advisable [*sic*] that I should have legal counsel to present my case, which at the first time, I sent in letters, your Honor, that I had insufficiency of counsel. That's when I went pro se. You advised me that the seriousness of the charges I was facing would be too much for me, and that I was ignorant of the law, which isn't true. . . . I would like all this stuff to be admitted into evidence. And if my lawyer is not presenting a case for me and not fighting it, your Honor, then what chance to [sic] I have?

The court then asked Wells what the lies were to which he referred, and Wells stated that it was a lie that he exited the bus

and stabbed Harris in the chest. He then stated, "I'm going to go from memory, and I'm going to tell you what did happen." Wells related that he did talk to Smith, he did chase her, and she did run, but that she fell and that he did not knock her down. He stated that Harris came at him with a weapon, that they struggled and that he stabbed Harris, but that he then became scared, dropped the knife, and ran. When the court asked Wells who stabbed Smith, Wells stated that "in the struggle, [Harris] coming at me, evidently [Harris] had stabbed her." Wells said that he "asked [counsel] to bring in the doctors to prove the wounds did not, that they could not happen the way they stated. And yet there was no doctors here." Wells then asked again for someone to read the statements and put them in the record. The court asked Wells if he was finished, and then issued Wells' sentence.

## C. Appellate Procedural History

Wells appealed his conviction, arguing that the trial court erred by failing to investigate his post-trial claims that his counsel was ineffective (1) for failing to impeach the prosecution's witnesses and (2) for failing to call medical witnesses to support his innocence.[3] The appellate court, relying on Illinois case law, held that a court need not appoint counsel to represent a defendant in a post-trial motion alleging ineffective

---

[3]His appeal also contended that the court failed to credit him the proper number of days for time he served in custody pending trial; that portion of his appeal was uncontested and was granted.

assistance of counsel unless, after conducting a preliminary investigation, the court determines that the allegations have merit. *People v. Wells*, No. 1-01-0935, slip op. at 8-9 (Ill. App. Ct. Feb. 3, 2003). The appellate court concluded:

> The record in the case at bar supports the conclusion that defense counsel actively cross-examined the State's witnesses, that defendant discussed these tactics with his counsel, and that the trial court found defendants's claim [*sic*] relate to trial tactics. Under these circumstances, the record shows that defendant acquiesced to counsel's trial strategy and the court was not required to make any further investigation.

*Id.* at 10. Wells filed a petition for leave to appeal to the Supreme Court, making the same argument about the trial court's failure to investigate his ineffective assistance claims, but the Supreme Court denied his petition. *People v. Wells*, 204 Ill. 2d 681, 275 Ill. Dec. 82, 792 N.E.2d 313 (2003).

Wells next filed a post-conviction petition before the trial court. He argued that (1) Wells received ineffective assistance of counsel because his counsel failed to raise a self-defense argument, presented no defense witnesses, did not investigate his medical history, did not contact certain witnesses who would have helped him, conceded his guilt during closing arguments, and failed to impeach certain witnesses with their previous inconsistent statements; (2) Wells was not able to assist in his own defense; (3) the prosecutor knowingly used perjured testimony; (4) Wells was not found guilty beyond a reasonable doubt; (5) Wells had counsel

"forced on him" by the trial court; (6) the state's attorney failed to tender all discovery to Wells; and (7) the trial court was biased against Wells.[4]

The trial court concluded that Wells had waived those arguments that he could have raised on direct appeal, including his arguments about the use of perjured testimony, the tender of complete discovery, and the forcing of trial counsel upon him.[5] *People v. Wells*, No. 99 CR 15694, slip op. at 5 (Cir. Ct. Cook Co. Mar. 10, 2004). The court also rejected Wells' ineffective assistance arguments because Wells had not explained what witnesses his counsel should have called and how their testimony would have assisted his defense.[6] *Id.* at 6. The court similarly concluded that Wells had not shown what perjured testimony was presented or that the prosecutor knew the testimony was perjured, and had not shown what evidence the prosecution purportedly withheld. *Id.* at

---

[4]Wells' argument concerning the bias of the trial court was not mentioned by the court in its opinion, but Wells has not raised this argument in his habeas petition so I need not consider it.

[5]The court also stated, however, that the evidence showed that Wells had agreed to continue with appointed counsel after initially firing and rehiring his counsel, so his argument that counsel was forced on him was without merit. *See id.* at 10.

[6]Wells attached to his motion affidavits from his brother James Wells and from Joseph Wells, whose relationship to Wells is unknown. Both stated that they were never called to testify. Neither affidavit explained what the affiant would have testified had he been called.

7-8, 9.[7]   In rejecting Wells' "reasonable doubt" argument, the court concluded that there was ample evidence supporting Wells' conviction. *Id.* at 8-9.

Wells appealed the denial of his post-conviction petition, arguing that the lower court was incorrect that the doctrine of waiver applied to bar some of his claims.  Wells also argued that the trial court failed to address some of his claims, including that his trial counsel failed to investigate his mental health history and the charges against him, and that trial counsel failed to impeach witnesses with their prior inconsistent statements.  The court of appeals affirmed the trial court's denial of Wells' post-trial petition.  *People v. Wells*, No. 1-04-1738 (Ill App. Ct. Dec. 16, 2005).  The court affirmed that the doctrines of res judicata and waiver apply to post-conviction petitions.  *Id.* at 4-5 (citing *People v. Blair*, 215 Ill. 2d 427, 294 Ill. Dec. 654, 831 N.E.2d 604 (2005)).  In addressing the argument that the trial court did not rule on some of Wells' claims, the court held that the trial court dismissed Wells' petition in its entirety, so "defendant's contention that the trial court engaged in 'piecemeal litigation' fails." *Id.* at 5.  In addition, the court held that Wells had no

---

[7]The court noted that the only evidence of perjured testimony was a letter to the ARDC from Wells' public defender, apparently in response to Wells' complaint to that body, stating that although a mistake of address was given before the grand jury, that error was corrected through a motion by the prosecution, and there was no evidence that this error had anything to do with the evidence at trial. *Id.* at 7-8.

ineffective assistance claim because there was overwhelming evidence of his guilt, so his trial counsel's strategy to frame Wells' actions as less than attempted first-degree murder was a reasonable strategy. *Id.* at 6. In addition, the court noted that the defendant's post-conviction petition included a letter from his counsel in which she stated that she had attempted to obtain Wells' medical records but had been unsuccessful and that those records would not have bolstered her theory of defense. *Id.* at 7. Wells subsequently filed a petition for leave to appeal to the Supreme Court on the same grounds, but the Supreme Court denied that petition. *People v. Wells*, 218 Ill. 2d 555, 303 Ill. Dec. 8, 850 N.E.2d 813 (2006).

D. Wells' Petition for a Writ of Habeas Corpus

Wells then filed his petition for a writ of habeas corpus before this court, raising six separate arguments. He contends that (1) his counsel was ineffective because she did not assert a defense and failed to investigate witnesses who might have been helpful to his case; (2) his counsel was ineffective because she did not investigate his psychiatric history; (3) his counsel was ineffective because she failed to impeach the victims with their prior inconsistent statements; (4) the prosecutor knowingly used perjured testimony; (5) the prosecutor intentionally failed to turn

over discovery; and (6) the trial court forced counsel on him.[8]
Bartley responded; Wells did not file a reply.  I ordered the
parties to submit supplemental briefing on the merits of Wells'
third ineffective assistance of counsel claim concerning the
failure to impeach the victims, and both parties submitted
supplemental briefs.[9]  I later appointed counsel to represent Wells
and ordered additional briefing on this subject.

---

[8]I give Wells' petition a generous interpretation because it
was prepared without the assistance of counsel.  *Lewis v. Sternes*,
390 F.3d 1019, 1027 (7th Cir. 2004) (citing *Haines v. Kerner*, 404
U.S. 519, 520 (1972)).

[9]Pursuant to my November 1, 2006 order, petitioner submitted
a supplemental brief, and respondent submitted a supplement to
respondent's answer.  Wells' brief included a signed declaration
that, to the best of his knowledge, his submission was in
compliance with 720 Ill. Comp. Stat. 5/32-2, a provision that
defines the crime of perjury.  In Wells' brief he also raises, for
the first time, additional claims, including that his counsel's
supposed racial bias caused her to "predetermine" his guilt and
that his counsel was ineffective because during the closing
argument there was an "omission of guilt."  Although I interpret
Wells' pleadings liberally, arguments raised for the first time in
a reply brief are deemed waived.  *See, e.g.,* *Bobo v. Kolb*, 969 F.2d
391, 400 (7th Cir. 1992).  Regardless, Wells has provided no
evidence from which I can give any credence to the allegation of
racial prejudice on the part of his counsel.  Further, Wells'
counsel did not concede his guilt during her closing argument.  She
acknowledged that the evidence indicated that Wells had stabbed
Harris and Smith, but forcefully argued that Wells had not intended
to murder either individual.  In light of the evidence, this was a
reasonable trial strategy.  *See Bell v. Cone*, 535 U.S. 685, 698
(2002) (holding that counsel is not ineffective where his actions
are part of a reasonable trial strategy) (quoting *Strickland v.
Washington*, 466 U.S. 668, 689 (1984)).

The federal statute governing petitions for writs of habeas corpus, 28 U.S.C. § 2254, provides a "highly deferential standard of review." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (citing *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)). This standard requires federal courts to give the benefit of the doubt to decisions by state courts, intervening only if a decision is "objectively unreasonable." *Woodford*, 537 U.S. at 24-27. Under the terms of § 2254, a federal court may grant a petition for a writ of habeas corpus only if the state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence" presented during the state court proceedings. 28 U.S.C. § 2254(d).

In addition to this deferential standard, a federal court may generally grant a petition for a writ of habeas corpus only where "the applicant has exhausted the remedies available in the courts of the State" and where the applicant has not procedurally defaulted his claims. 28 U.S.C. § 2254(b)(1)(A); *Farrell v. Lane*, 939 F.2d 409, 410 (7th Cir. 1991).[10] These limitations are intended

---

[10]Section 2254 also provides, however, that I may deny a writ of habeas corpus on the merits "notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2).

to allow state courts a fair opportunity to hear and act on a petitioner's claims. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999). Procedural default may occur where the petitioner did not comply with state procedural requirements during his appeals in state court such that the state court found those failures to be an "independent and adequate" state law ground for denying his claim. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). When a state court relies on a state procedural ground to avoid reaching the merits of a petitioner's claim, that ground must be clearly and expressly relied upon and must be firmly established and regularly followed. *Braun v. Powell*, 227 F.3d 908, 912 (7th Cir. 2000). To avoid procedural default, a petitioner must, at minimum, "invok[e] one complete round of the State's established appellate review process" for each of his claims. *O'Sullivan*, 526 U.S. at 845. In Illinois, this means one full round of appeals up to and including the filing of a petition for leave to appeal to the Illinois Supreme Court. *Id.* at 845-46; *see also Lewis*, 390 F.3d at 1025 (requiring a claim to be raised through one full round of appeals, either on direct appeal of the petitioner's conviction or through post-conviction proceedings, to avoid procedural default).

In his answer, respondent contends that Wells has procedurally defaulted on three of his claims because he did not raise them through one complete round of state court review. Wells first raised his claims concerning perjured testimony, failure to tender

discovery, and having trial counsel "forced on him" in his petition for post-conviction relief, and the trial court found that Wells was barred from raising these claims by the doctrines of waiver and res judicata. In Wells' appeal of his post-conviction petition, Wells did not specifically raise any of these issues; he argued that the doctrines of waiver and res judicata should not apply to bar these claims, but he did not contest the underlying merits of these claims. In his petition for leave to appeal to the Supreme Court, Wells again argued that the doctrines of waiver and res judicata should not apply to bar these claims. Although Wells did not argue the underlying merits of these three claims at each level of the Illinois review process, he did raise the issue through one full round of appeals as required to avoid procedural default. *See O'Sullivan*, 526 U.S. at 845-46.[11] Therefore, respondent is incorrect that Wells has procedurally defaulted these claims on this basis, and I will consider whether Wells has shown that, as to any of his claims, the state court proceedings resulted in a decision that was objectively unreasonable. *See Woodford*, 537 U.S. at 24-27.

---

[11]Respondent did not argue that Wells has procedurally defaulted these claims because the state court used independent state law grounds, res judicata and waiver, to reject these claims. The Seventh Circuit has held that the doctrine of waiver is an independent state law ground. *See, e.g.*, *Miranda v. Leibach*, 394 F.3d 984, 995 (7th Cir. 2005). However, because I conclude that these claims are without merit, I need not consider this issue. 28 U.S.C. § 2254(b)(2).

Initially, respondent did not argue that Wells procedurally defaulted his claim of ineffective assistance based on trial counsel's failure to impeach the victims' testimony with prior inconsistent statements. Rather, in his answer, Respondent contends that petitioner's assertion of a claim of ineffective assistance due to trial counsel's failure to impeach was addressed by the state post-conviction trial and appellate courts and determined to be without merit. In the second round of supplemental briefing, however, respondent now argues in his response to petitioner's supplemental memorandum that Wells procedurally defaulted the specific aspect of his ineffective assistance claim addressed in petitioner's supplemental memorandum - namely, that trial counsel failed to impeach the victims' testimony regarding statements bearing on petitioner's intent - "by failing to alert the state courts to the 'inconsistent statements' on which he now relies." Petitioner replies that respondent forfeited the procedural default defense, and that petitioner properly raised this aspect of his ineffective assistance claim. In his sur-reply, respondent contends that he did not forfeit the procedural default argument, but rather raised it at the first possible opportunity. As explained below, I find that Wells fairly presented this issue to the state court.

A.  Ineffective Assistance:  Lack of a Defense
and Investigation of Witnesses

Wells first contends that he received ineffective assistance of counsel because his trial counsel did not assert a defense, and because his counsel failed to investigate witnesses who would have helped his defense.  To establish an ineffective assistance of counsel claim, Wells must show that his counsel's performance fell below an objective standard of reasonableness *and* that he suffered substantial prejudice as a result.  *See Strickland*, 466 U.S. at 674.  In order to grant Wells' habeas petition on this claim, I must find that the state court's analysis of this claim under *Strickland* was unreasonable.  *See Rompilla v. Beard*, 545 U.S. 374, 380-81 (2005).  Here, Wells previously raised this claim in his state court post-conviction petition for relief.  The trial court held that this argument was without merit because Wells had not shown what witnesses his counsel should have called and how those witnesses would have assisted his case.  *People v. Wells*, No. 99 CR 15694, slip op. at 6.  The appellate court held, in affirming the trial court's decision, that the defense counsel's trial strategy was a reasonable one, but it did not specifically address the failure to investigate witnesses.  *People v. Wells*, No. 1-04-1738, slip op. at 6.

I find that the state court's analysis of this claim under *Strickland* was not unreasonable.  As the trial court noted, although Wells contended his counsel should have investigated or

called other witnesses to testify on his behalf, Wells did not state who counsel should have called, what they would have said, and how this would have helped his case. *People v. Wells*, No. 99 CR 15694, slip op. at 6. The trial court also noted that the Illinois Post-Conviction Act requires petitioners to support their petitions with affidavits, records, or evidence, but Wells did not do so before that court and has not done so here. *Id.* (citing *People v. Lemons*, 242 Ill. App. 3d 941, 184 Ill. Dec. 642, 613 N.E.2d 1234 (Ill. App. Ct. 1993).[12] The affidavits that are in the record only state that there were two witnesses available to testify, but they do not explain what those witnesses would have said. Nor may I grant Wells an evidentiary hearing in order to allow him to now develop a factual basis for this claim. Where a petitioner has failed to develop a factual basis for his claim in state court proceedings, a federal court cannot hold an evidentiary hearing unless the petitioner shows that (1) the claim relies on a new, retroactive constitutional rule or "a factual predicate that could not have been previously discovered through the exercise of due diligence"; and (2) "the facts underlying the claim would be

_____

[12]At least one federal court has noted that failure to support a claim with evidence as required by the Illinois Post-Conviction Act constitutes procedural default. *See, e.g.*, *United States ex rel. Novak v. Grankey*, 871 F. Supp. 1053, 1056 (N.D. Ill. 1995) (holding that the petitioner's claims were procedurally defaulted where he failed to include facts supporting a post-conviction petition, as required by 725 ILL. COMP. STAT. 5/122-2). Respondent here has not argued that this claim is procedurally defaulted.

sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder could have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2). Wells has met neither of these elements.

With respect to defense counsel's strategy at trial, the evidence does not show that his counsel's presentation of his case, apart from the impeachment issue discussed below, was unreasonable or caused him substantial prejudice.[13] As the opinion of the state appeals court noted, there was substantial evidence presented at Wells' trial that he had stabbed Harris and Smith. Wells' counsel therefore focused her defense on showing that Wells had not intended to kill them. The jury found Wells not guilty of attempted murder for Harris' stabbing, although it did convict him of this charge for Smith's stabbing. *People v. Wells*, No. 1-04-1738, slip op. at 6. Because the state court's resolution of this claim was not objectively unreasonable, I deny Wells' petition with respect to this claim. *See Woodford*, 537 U.S. at 24-27.

_____

[13]The evidence that Wells stabbed Harris and Smith primarily came from the testimony of Harris, Smith, and Cole. Counsel could have challenged Harris and Smith's credibility, as she did with Cole's, and argued that they were lying about Wells stabbing them, as she could have done in challenging their testimony about Wells's intent. However, it was not unreasonable for counsel to conclude that a jury would believe Harris and Smith's testimony that Wells stabbed them but not believe their testimony about Wells's intent, and therefore concede that Wells had stabbed Harris and Smith but dispute whether he intended to kill them.

B.  Ineffective Assistance:  Psychiatric History

Wells' second claim of ineffective assistance is that his counsel was ineffective for failing to investigate his psychiatric history.  Wells first raised this claim in his petition for post-conviction relief, but the trial court did not address the claim in denying his petition.  The appellate court, in reviewing the dismissal of his post-conviction petition, stated that this claim was without merit because the only evidence in the record concerning Wells' mental health were letters from (1) Wells' counsel in which she stated that she had attempted to obtain Wells' medical records but had been unsuccessful, and that his records would not have helped her defense theory; and (2) a psychiatrist indicating that he believed Wells was fit to stand trial, but would need more records to determine whether or not Wells was sane at the time of the stabbings.  *People v. Wells*, No. 1-04-1738, slip op. at 7.  Wells has presented no evidence before this court that would indicate that he suffered any prejudice from his counsel's failure to raise his mental health as an issue at trial.  *See Strickland*, 466 U.S. at 674.  In his petition for post-conviction relief before the state trial court Wells presented no evidence from which I could conclude that an examination of his mental health would have made a difference at his trial.  Therefore, I cannot conclude that his counsel's performance with respect to this issue was

ineffective, or that the state court's analysis of this claim under *Strickland* was unreasonable. *See Woodford*, 537 U.S. at 24-27.

## C. Perjured Testimony

Wells has not presented sufficient evidence to show that the prosecutor knowingly allowed the use of perjured testimony. Wells previously raised this claim in his post-conviction petition in state court, but the trial court found that Wells had waived this claim by not raising it on direct appeal, and that even were it not waived, he had not presented any evidence that any particular trial testimony was perjured. *See People v. Wells*, No. 99 CR 15694, slip op. at 4, 7-8. The appellate court affirmed the holding that Wells had waived this claim. *People v. Wells*, No. 1-04-1738, slip op. at 5.

Setting aside the question of whether Wells waived this claim, I find that Wells has not shown that this claim has merit. As Wells notes, a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. *See, e.g.*, *United States v. Agurs*, 427 U.S. 97, 103 (1976) (internal citations omitted). As the trial court noted in rejecting Wells' post-conviction petition, Wells has not presented any evidence to this court that any witness presented perjured testimony or that the prosecutor knowingly allowed perjured testimony. The mere fact that testimony from

certain witnesses may have differed from statements those witnesses may have given to the police does not prove that the testimony was false, or that the prosecutor should have believed that testimony to be perjured.  The only evidence in the record of any perjured testimony is an inference from a letter sent to the ARDC by Wells' counsel that there was a mistake of address presented during grand jury proceedings on Wells' case that was corrected by the prosecutor.  This is not enough to establish that testimony was perjured.

### D.  Failure to Tender Discovery

Wells' next argument is that the prosecution failed to tender discovery.  Wells raised this argument in his post-conviction petition, but the trial court determined Wells has waived this argument, and additionally noted that Wells had not explicitly identified any evidence that the prosecution failed to tender or how this evidence would have helped his case.  *People v. Wells*, No. 99 CR 15694, slip op. at 5.  The appellate court affirmed that this claim had been waived without addressing its substantive merit. *People v. Wells*, No. 1-04-1738, slip op. at 5.

Setting aside the issue of waiver, Wells has not established this claim.  As the Supreme Court held in *Brady v. Maryland*, 373 U.S. 83 (1963) a prosecutor violates a defendant's right to due process when, upon request, he suppresses evidence favorable to an accused where that evidence is material to guilt or punishment,

regardless of the good faith or bad faith of the prosecutor. *Id.* at 87. To establish a claim under *Brady* for purposes of a habeas corpus petition, a defendant must show (1) the evidence was favorable to the defendant because it was exculpatory or impeaching; (2) the evidence was suppressed by the State; and (3) the defendant suffered prejudice as a result. *See Banks v. Dretke*, 540 U.S. 668, 691 (2004) (internal citations omitted). Here, Wells has not provided this court with any evidence from which the court could conclude that any of these elements have been met. Therefore, Wells' petition is denied as to this claim.

### E. Trial Court's "Forcing" of Counsel on Petitioner

I also conclude that Wells cannot establish his claim that the trial court "forced" counsel on him. Like his claims about perjured testimony and withheld discovery, Wells first raised this claim in his post-conviction petition, and the trial court determined he had waived the claim, but also noted that the record showed that Wells agreed to continue with appointed counsel after initially hiring and rehiring his appointed counsel. *People v. Wells*, No. 99 CR 15694, slip op. at 5, 10. On appeal, the appellate court affirmed that the claim was waived without addressing its merits. *People v. Wells*, No. 1-04-1738, slip op. at 5.

A defendant's Sixth Amendment right to counsel includes the right for a defendant to represent himself in a criminal

proceeding. *See Faretta v. California*, 422 U.S. 806, 819 (1975).
However, this right is only absolute prior to the beginning of the
defendant's trial. *See Brooks v. McCaughtry*, 380 F.3d 1009, 1011
(7th Cir. 2004) (internal citations omitted). "Once trial
commences, the [court] retains discretion to balance the interests
of the defendant against the potential disruption of the
proceedings already in progress." *United States v. Kosmel*, 272
F.3d 501, 505-06 (7th Cir. 2001). Similarly, a motion to delay an
in-progress trial to obtain new counsel is subject to the court's
discretion. *See Morris v. Slappy*, 461 U.S. 1, 11-12 (1983)
("[B]road discretion must be granted trial courts on matters of
continuances; only an unreasoning and arbitrary 'insistence upon
expeditiousness in the face of a justifiable request for delay'
violates the right to the assistance of counsel.") (quoting *Ungar
v. Sarafite*, 376 U.S. 575, 589 (1964)).

Wells initially asked for new counsel and new counsel was
appointed. He did not raise another objection to his counsel's
conduct until the trial, during which he briefly attempted to
represent himself or to stay the trial to obtain new counsel. It
was within the court's discretion at this time to refuse to allow
Wells to represent himself and to refuse to delay the trial for
Wells to seek new counsel. Further, after the court denied these
requests it appears from the record that Wells presented no
further complaints until the sentencing phase of his trial. Wells

has not presented a claim before this court about a lack of representation during his sentencing, but only about his counsel's performance during his trial. Therefore, Wells' claim is without merit.

F.  Ineffective Assistance:  Failure to Impeach Victims

Wells' argument that his counsel was ineffective for failing to impeach the victims is the most difficult to resolve. Wells previously raised a version of this claim on direct appeal from his conviction, arguing that the district court erred by not granting him a post-trial hearing and by not appointing him new counsel to further present this claim. *See People v. Wells*, No. 1-01-0935, slip op. at 9-10. The appellate court concluded that the trial court need not appoint new counsel for Wells or further investigate his claims because the record showed that Wells' counsel "actively cross-examined the State's witnesses" and that Wells himself "acquiesced to counsel's trial strategy." *Id.* at 10. The appellate court concluded that the trial court found Wells' claims to be "spurious or pertaining to trial tactics" such that new counsel did not need to be appointed. *Id*. Wells also raised this claim in his post-conviction petition, but the trial court did not address this claim in rejecting Wells' petition. On appeal, the appellate court affirmed dismissal of his petition, finding that the trial court did not err in dismissing Wells' petition without addressing this claim. *See People v. Wells*, 1-04-1738, slip op. at

5.  The appellate court did not address the substance of this claim.

The appellate court's rejection of this claim on direct appeal was based on an analysis of Wells' ineffective assistance claim from a slightly different perspective, whether the trial court should have given Wells a post-trial hearing, rather than the straight-forward ineffective assistance analysis under *Strickland*. This raises the question whether Wells fairly presented this issue to the state court as required by the exhaustion provision of § 2254. *See O'Sullivan*, 526 U.S. at 844.  At least one judge in this district has determined that raising an ineffective assistance of counsel claim by arguing that the trial court erred in not ordering a post-trial hearing to determine if trial counsel was ineffective satisfies the requirements of § 2254 where a defendant making this argument on appeal is "plainly requesting a new post-trial hearing not for its own sake, but rather so that the merits of the claimed violation of his Sixth Amendment right to ineffective assistance of counsel could be addressed at that hearing." *United States ex rel. Sumner v. Washington*, 840 F. Supp. 562, 570-71 (N.D. Ill. 1993) (denying petition for writ of habeas corpus), *aff'd*, 65 F.3d 170 (7th Cir. 1995).  In addition, any grant by an appellate court of the defendant's request for a new post-trial hearing must, as the appellate court's decision here did, involve a "threshold

evaluation" of the underlying ineffective assistance claim the defendant is asserting. *Id.* at 571.[14]

Because Wells fairly presented this claim to the Illinois state courts, I may consider the merits of this claim. As discussed above, Wells must show that his counsel's failure to impeach the witnesses fell below an objective standard of reasonableness *and* that he suffered substantial prejudice as a result. *See Strickland*, 466 U.S. at 674. I also must find that the state courts' analysis of this claim under *Strickland* was unreasonable, either in their application of the law or their determination of the facts, under § 2254(d). *See Rompilla*, 545 U.S. at 380-81.

In answering Wells' petition, respondent initially argued that Wells cannot make the required showing because his petition does not articulate what prior statements were inconsistent with Harris'

---

[14]The opinion in *Sumner* was decided before the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub L. 104-132, 110 Stat. 1214 (1996), amended § 2254 to provide a stricter standard for review of habeas corpus petitions. However, nothing in the AEDPA's amendments to § 2254 changes this analysis. The Seventh Circuit has held, post-AEDPA, that a party has "fairly presented" a claim to the state court and thereby met its obligation to exhaust its remedies in state court under § 2254(b)(1) where the party has submitted both the "operative facts" and the "controlling legal principles" to the state court. *See Harding v. Sternes*, 380 F.3d 1034, 1046 (7th Cir. 2004) (quoting *Rodriguez v. Scillia*, 193 F.3d 913, 916 (7th Cir. 1999)). Here, the court in *Sumner* determined that a party had fairly presented an ineffective assistance argument to the state court because the party disclosed the factual basis for his claim and was clearly asserting an underlying ineffective assistance claim. 840 F. Supp. at 571. The same is true for Wells.

and Smith's testimony and how those statements would have impeached their testimony.  Although Wells' petition itself does not specifically describe the inconsistent statements, Wells' previous submissions to the Illinois state courts do.  Wells' petition for post-conviction relief includes an attached police report titled "Area 2 Supplementary Report."[15]  This report includes a summary of police interviews with Harris and Smith shortly after they were stabbed.  In this report, the police summarize Harris' statements to them:

> Harris related that he observed Smith running through the bus, exiting the rear doors and attempting to cross the street while being chased by Wells.  Harris went on to relate that he observed Wells pull out a knife and stab Smith in the back, at which point she fell to the ground.  Harris related that he ran to her assistance and attempted to pull Wells off of Smith, at which point he was stabbed in the left shoulder by Wells.  Harris stated that Wells then stabbed Smith a second time while she was on the ground.[16]

---

[15]In its supplemental brief the respondent concedes that "presumably" this report contains the statements at issue. Wells's supplemental brief also confirms that this report contains the statements he argues his counsel should have used to impeach Harris and Smith.  Further, in Wells's brief on direct appeal he references this report.  I note that, although the document attached to the petition for post-conviction relief appears to be a single document, petitioner attached it to his supplemental memorandum as two separate documents, both of which are titled "Area 2 Supplementary Report," but which bear different dates - "22 Jun 99" and "23 Jun 99."

[16]The Area 2 Supplementary Report dated "22 Jun 99" in the upper right-hand corner contains Harris's statement.

The police also summarize Smith's statements:

> As WELLS got on [the bus], I exited the rear doors and he exited the front doors. I knew it was time to get out when he got on. [Wells] chased me and [Harris] came to help. [Harris] was talking to his boss on the corner now. His boss was sitting in his car. I went behind [Harris] to get away from [Wells]. I saw him stab [Harris] first, and then I fell to the ground as I tried to get away. The whole time, I was kicking to get away and he stabbed me. I turned my body in another attempt to get away and he stabbed me again. . . . [Wells] looked crazy, like he had a demon look on his face. I knew he was going to kill me. . . [Wells] told me that he would kill me someday and I believed him.[17]

As Wells argued to the trial court and in his direct appeal, these statements differ from Smith's and Harris' trial testimony. Smith testified that, after stabbing her, Wells said, "Bitch, I told you I was going to kill you," but this statement does not appear in the police report, although the report states that Smith "knew [Wells] was going to kill [her]." In addition, at trial Smith testified that Wells hit her, knocking her to the ground, but in her statement she indicated that she fell. Harris' testimony at trial was also that Wells stated, "I told you I was going to kill you, bitch," although this statement does not appear in the police report. Further, Harris testified at trial that Wells stabbed him before he stabbed Smith, and that he did not touch Wells or push him away, which differs from the police report that states that

---

[17]The Area 2 Supplementary Report dated "23 Jun 99" in the upper right-hand corner contains Smith's statement.

Smith was stabbed first, and that Harris tried to pull Wells off Smith and was stabbed as a result.[18]

Wells argues that his attorney should have used the police report to impeach Harris' and Smith's testimony. He says that, in addition to raising the question of the general credibility of both witnesses since their testimony differed from their earlier statements, the impeachment could have undercut the prosecution's contention that Wells intended to kill Smith, since it called into question whether Wells had stated, "I told you I was going to kill you."

Respondent argues that the differences between the statements in the police reports and Harris' and Smith's trial testimony are "minimal" and do not provide any better alternative to defense counsel's decision to argue that Wells did not intend to kill Harris or Smith. Respondent also contends that failing to impeach Harris and Smith on these statements did not prejudice Wells because this impeachment would not have led to a different outcome. In addition, respondent asserts that the state court's analysis of this argument under *Strickland* was appropriate.

Respondent also argues that the proposed impeachment is improper under Illinois law because a witness can only be impeached with a substantially verbatim account of his statement, and

---

[18]In addition, the police reports do not mention the incidents that took place on June 3 and June 8 in which Wells purportedly threatened to kill Smith.

"nothing in the record suggests that the police reports contain a complete record of all information the victims related to the police . . . . " Respondent also contends that the witnesses' prior omission of the statement "I told you I was going to kill you" was not impeaching because it was neither necessary to the narrative nor directly responsive to a question. In his reply brief, petitioner does not address the propriety under Illinois law of the proposed impeachment.

I find that the Illinois appellate court was not unreasonable in concluding that counsel's failure to impeach Smith and Harris with the police report was not ineffective assistance, and that counsel's failure to so impeach the victims did not fall below an objective standard of reasonableness. The appellate court determined that counsel's failure to impeach the witnesses was a trial strategy, and that Wells had "acquiesced" in the strategy so that there was no need for the trial court to have investigated this claim further. *See People v. Wells*, No. 1-01-0935, slip op. at 9-10. Wells' comments during the trial indicate that he disagreed with his counsel's failure to impeach Harris and Smith, and that his counsel took the position that impeachment of Harris and Smith was a poor strategy.[19] To establish that this was

---

[19]Unlike a decision to testify in one's own defense or to admit one's own guilt, in which a defendant has control and may willingly participate, a defendant has no immediate control over the specific questions counsel asks of a witness, so Wells may not have had the opportunity to "acquiesce" in the specific questions his counsel

ineffective assistance, Wells must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Bell*, 535 U.S. at 698 (quoting *Strickland*, 466 U.S. at 689). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

First, it is unclear as a matter of Illinois law that trial counsel could have used the police report to impeach the victims' testimony. Petitioner cites *Moffett v. Kolb*, in which the Seventh Circuit affirmed the Wisconsin district court granting a petition for writ of habeas corpus where the petitioner's counsel failed to impeach a witness's testimony that he never told a police officer that he saw the petitioner's brother holding the gun, which directly contradicted the witness's statement to the police. 930 F.2d 1156, 1161 (7th Cir. 1991). In *Moffett*, the district court found that the failure to produce the police report rendered the witness's statement trustworthy, but had the witness been impeached

---

posed to Harris and Smith. *See Harding v. Sternes*, No. 00 C 7515, 2003 WL 21321340, at *5 (N.D. Ill. June 9, 2003) ("[D]ecisions concerning what questions to ask witnesses rest with the attorney, who presumably has the working legal knowledge to permit him to gauge the import of those questions and the potential impact each may have on the jury."), *aff'd,* 380 F.3d 1034 (7th Cir. 2004).

with the earlier statement the jury would have had to assess his credibility. *Id.*

Respondent argues that the victims could not have been impeached with the police report, relying on Illinois case law concluding that a witness cannot be impeached by a statement that is not in his own words or "substantially verbatim." *See People v. Hood*, 229 Ill. App. 3d 202, 211-13, 593 N.E.2d 805, 811-13 (Ill. App. Ct. 1992) (finding prosecution's impeachment of defense witness using police report based on omission of statements to police that witness observed incident or that offender had blond hair improper because there was no showing that report was substantially verbatim account of witness' testimony); *People v. Matthews*, 7 Ill. App. 3d 1059, 1063, 289 N.E.2d 98, 101-02 (Ill. App. Ct. 1972) (defendant was not prejudiced nor denied rights to cross-examine or to confront witnesses by being prohibited from asking police officer question about information not contained in arrest report in attempt to impeach state's witnesses where defense made no attempt to show report was substantially verbatim account of witness' testimony nor specifically attributable to any particular witnesses). *Moffett* does not address the issue of the ability as a matter of state law to impeach witnesses with statements not shown to be substantially verbatim accounts, and petitioner neither challenges respondent's assertion nor cites any case law to the contrary. Here, as to Smith's interview, the

police report indicates that, "The following is a summary of this interview[;]" and, as to Harris, that, he "related the following in summary."  The evidence does not show that the police report contains substantially verbatim accounts of the witnesses' statements.

Additionally, there is evidence in the record, from what Wells relayed to the trial court during one of his objections to his counsel's performance, that Wells' trial counsel chose not to use the police report because she felt it would be more damaging to Wells.  While the police report contains information that was already elicited from Harris and Smith, the "summary" of Smith's interview in the police report additionally states that she "knew [Wells] was going to kill [her]."  The police report also contains an account of Wells turning himself into the police, although Wells' counsel told the jury during her opening statement that Wells had surrendered.  Further, in addition to the victims' interviews, the police report includes an interview of Cole that states, "[Smith] was on the ground and [Wells][20] was standing over her, telling her that he was going to kill her."  The information from Cole's interview was not elicited at trial,[21] but nevertheless

_____

[20]The police report indicates that Cole "states that he saw Johnny, who he knows from the neighborhood, and who he knows by the nickname as 'Hustle Man' . . . . " Cole also testified at trial that he called Wells "Hustleman."

[21]At trial, Cole testified that Smith fell, Wells started hitting her, and he was "leaning over stabbing her."  At that

bears on the question of Wells' intent, corroborating Smith's and Harris' trial testimony that Wells said, "I told you I was going to kill you." Trial counsel's strategy was to frame Wells' actions as something less than attempted first-degree murder. Given this strategy, and in light of the potentially harmful information from Smith's interview as well as the corroborating information from the interview of a witness other than the victims, I cannot say it would be unreasonable to make a tactical decision not to attempt impeachment on this point.

### III.

For the above reasons, I deny Wells' petition for a writ of habeas corpus.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated:  May 16, 2008

---

point, Cole was on a cell phone trying to call 911. Cole was asked if he was able to hear anything that was going on, and he answered, "No, I was really trying to get 911, so I wouldn't say I really heard anything." Cole was not asked what, if anything, Wells (or anyone else) said.